UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN JANOSKO, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>CITY OF OAKLAND,<br><br>　　　　　Defendant. | Case No. 3:23-cv-00035-WHO<br><br>**ORDER GRANTING TEMPORARY RESTRAINING ORDER**<br><br>Re: Dkt. No. 4 |

　　　　Plaintiffs John Janosko and Jaz Colibri are individuals experiencing homelessness who currently reside at an encampment at 1707 Wood Street in Oakland, California ("the 1707 Encampment"). The City of Oakland, which owns the land upon which the plaintiffs reside, posted "Notice[s] to Vacate Illegal Encampment" on December 22, 2022, stating that the site would be cleared of persons and property beginning on January 9, 2023. The plaintiffs moved for a Temporary Restraining Order ("TRO") to enjoin the City from closing the encampment and removing residents and their property. Subsequently, on January 6, 2023, the City posted amended notices stating city workers would be "temporarily" working at the site from January 9 to 13, 2023, and that residents must "temporarily vacate" and "remove all personal belongings" between the hours of 9:00 a.m. and 1:00 p.m. each day.

　　　　For the reasons that follow, I GRANT the plaintiffs' motion for a TRO on a limited basis. Even with the City's amended notices and representations that it will not permanently displace anyone during the deep cleaning period next week, the plaintiffs have raised serious questions that the state will violate their constitutional rights by placing them in increased danger by being forced out of shelter during severe weather, in the midst of an ongoing "tripledemic," and without adequate plans to provide shelter. The TRO shall remain in place until a hearing on January 18,

2023, to assess the status of available shelter options as well as offers made and accepted. The terms of the TRO are outlined in detail below. The TRO is contingent on there being no new, serious public safety concerns arising from the encampment, and on the encampment not increasing materially in size—either by total residents or total square footage. This TRO is not a long-term prohibition on Oakland's actions but rather a stopgap to prevent violation of constitutional rights that are likely to result from the combination of the state-of-emergency weather situation and the failure to provide alternative shelter.

## BACKGROUND

On January 4, 2023, the plaintiffs filed this suit and moved for a TRO. *See* Complaint ("Compl.") [Dkt. No. 1]; Motion for Temporary Restraining Order ("Mot.") [Dkt. No. 4]. The complaint brings claims for violations of the plaintiffs' rights under (1) the Fourteenth Amendment and the state-created danger doctrine; (2) the Due Process Clause of the California Constitution, Article 1 § 7(a); (3) the Fourth Amendment's protection against unreasonable search and seizure; (4) the protection against unreasonable search and seizure under California Constitution Article 1 § 13; (5) for Janosko, the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12131 et seq.; and (6) for Janosko, the protection against discrimination against persons with disabilities under California Government Code section 11135.

According to the complaint and the sworn declarations, the City of Oakland, via its Public Works Department, posted notices on December 22, 2022, stating that the encampment was illegal and the site was uninhabitable, and directed persons to vacate and remove their belongings. Mot. Declaration of Brigitte Nicoletti ("Nicoletti Decl.") [Dkt. No. 4] Ex. F. The notice also said that on January 9, 2023, Public Works Department would begin to clear out the encampment and remove and store any remaining property, except property it deemed unsafe or hazardous which would immediately be discarded. *Id.* After the plaintiffs filed the complaint and motion for the TRO, the City posted amended notices stating that on January 9, 2023, it would begin a temporary "deep cleaning" of the site and ordered residents to leave, with their possessions, every day from January 9 to 13, 2023, between the hours of 9:00 a.m. and 1:00 p.m.. Declaration of Brigitte Nicoletti iso Motion for TRO ("Nicoletti Decl. ISO Mot.") [Dkt. No. 14].

The plaintiffs allege that 42 Oakland residents currently live in the 1707 Encampment, with another 13 to 15 individuals living on the street itself. Mot. 1:17-18. They assert that the City of Oakland seeks to remove all of them from the encampment when there are only 27 shelter beds available in the city, *id.* 1:23-24, 11:22-26, there are "historic storms" bearing down on the area, *id.* 9:15-19, 12:24-28; Nicoletti Decl. ¶ 30, Ex. D, and the COVID-19 pandemic is ongoing while the spread of other viruses has created a "tripledemic," Mot. 1:20-22, 9:14-16, 12:27-28.

The City of Oakland opposes. ("Oppo.") [Dkt. No. 16]. It asserts that the closure is necessary so that it can secure, clean, and assess the land parcel to begin the process of planning for and developing a 170-unit affordable housing unit on the lot. *Id.* 1:2-2:13. The City says that it began clean up and outreach activities in 2022 and is working on "temporary emergency shelter options" including a "state-funded cabin community." Oppo. Declaration of LaTonda Simmons ("Simmons Decl.") ¶¶ 6, 15-16. The City also says that it previously missed funding deadlines for the development and so needs to close the encampment to meet new deadlines, though neither attributes the missed deadlines to the inhabited encampment nor clarifies the new deadlines. *Id.* ¶ 11.

I held a hearing at which counsel for both parties appeared.[1]

**LEGAL STANDARD**

Federal Rule of Civil Procedure 65 governs TROs. The standard for issuing a TRO is the same as that for issuing a preliminary injunction, which requires the plaintiff to establish: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. The Ninth Circuit has held that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can

---

[1] Counsel for the City of Oakland made several representations during the hearing, as discussed throughout this Order. I accept those representations as made in good faith based on the information available to her.

3

support issuance of an injunction, assuming the other two elements of the Winter test are also met." *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

## DISCUSSION

For the reasons that follow, I conclude that—upon this unique confluence of present circumstances and at this early procedural posture—the plaintiffs have shown "serious questions going to the merits," *Cottrell*, 632 F.3d at 1132, of their state-created danger claim that the City would force the plaintiffs to abandon their existing shelters during this state-of-emergency weather crisis, with no adequate plans for sheltering them. At this juncture, the "hardship balance . . . tips sharply toward the plaintiff[s]," *id.*, for a limited time until City comes up with an adequate plan for shelter. There will be a point soon where the balance of equities no longer favors the plaintiffs. The City needs to clear the lot so that it can begin developing a 170-unit 100 percent affordable housing unit, which will strongly benefit the public and likely benefit some of the individuals residing at the current encampment. *See* Oppo. 1-2.

With respect to the state-created danger argument, the plaintiffs say that by evicting the residents of the 1707 Encampment, the City will affirmatively act to expose residents to known and obvious dangers from the severe rainstorms, other inclement weather, and ongoing pandemic and "tripledemic" conditions. In opposition, the City asserts that there will be sufficient shelter beds to house all the residents when they leave the 1707 Encampment and that its amended plan to do a "deep cleaning" the week before the full closure will prevent plaintiffs from having to find new housing or losing their belongings.

The Due Process Clause of the United States Constitution "does not 'impose a duty on the state to protect individuals from third parties.'" *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019) (quoting *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007)). But an exception to this rule is where the state "affirmatively places [a plaintiff] in danger by acting with deliberate indifference to a known or obvious danger." *Id.* (internal quotation marks omitted) (citing *Patel v. Kent. Sch. Dist.*, 648 F.3d 965, 971-72 (9th Cir. 2011)). To succeed on a claim under the state-created danger doctrine, plaintiffs must establish, (1) "that the officers' affirmative actions created or exposed [them] to an actual, particularized danger that [they] would not

1   otherwise have faced"; (2) "that the injury [they] suffered was foreseeable"; and (3) "that the
2   officers were deliberately indifferent to the known danger." *Id.* (citing *Hernandez v. City of San*
3   *Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018)).

4   Alleging that the government demolished an unhoused individual's "shelter and property
5   essential to protection from the elements" including "cold and freezing temperatures, rain, and
6   other difficult physical conditions" is sufficient to state a claim for state-created danger under the
7   Fourteenth Amendment. *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1102 (E.D. Cal. 2012);
8   *see also Jeremiah v. Sutter Cnty*, No. 218-CV-00522-TLN-KJN, 2018 WL 1367541, at *5 (E.D.
9   Cal. Mar. 16, 2018) (finding, where homeless plaintiffs alleged they rely on their property and
10  shelters to "stay physical safe from the elements" including ongoing "wind, rain, and cold
11  weather" that the government "would knowingly place the homeless at increased risk of harm if it
12  confiscates and seizes Plaintiffs' shelters and possession"). As in *Sanchez* and *Jeremiah*, here the
13  plaintiffs assert that the City's closure of the 1707 Encampment coincides with severe weather
14  conditions, including historic levels of rainfall, and that removing them and their belongings from
15  the camp will affirmatively expose them to harsher, more dangerous conditions than if they were
16  able to stay in the camp. This is in large part due to the allegation that the City does not have
17  sufficient shelter beds available for the residents of the 1707 Encampment. That is sufficient to
18  show likelihood of state-created danger at this preliminary stage.

19  There are at least 26 to 27 shelter beds currently available in a congregate setting (which
20  the plaintiffs state is undesirable for a variety of reasons). But there are over 50 individuals at the
21  1707 Encampment according to plaintiffs; the number of shelter beds is insufficient. *See* Mot.
22  1:17-22. Moreover, the City represents in its papers that at least 31 additional beds will be
23  available by January 20, 2023, in the "cabin community" being constructed down the road from
24  the 1707 Encampment, which was specifically planned for residents of this encampment. *See*
25  Oppo. 1:22-26; Simmons Decl. ¶¶ 6-7. The City also notes that 29 new RV spaces will be
26  available by January 17, 2023. Simmons Decl. ¶ 22.

27  In light of those facts, a brief delay in the City's planned eviction of plaintiffs will ensure
28  there are sufficient shelter options for encampment residents during the storms. The closure

1   should be postponed until those new spaces are available.

2       The City also represented that its amended plan to "deep clean" the 1707 Encampment would permit the plaintiffs to stay in their existing shelters and keep their belongings for an additional week. But it was not clear from the City's papers or statements at the hearing how or if this would happen. The notice posted at the encampment says that the occupants would have to "temporarily" vacate the site, with any belongings they wished to keep, from 9:00 a.m. until 1:00 p.m. every day. *See* Dkt. No. 14. Assuming that is correct, the City does not provide an adequate answer for how the plaintiffs would be protected from the rain and elements during those periods. And the plaintiffs have raised substantial questions concerning the City's seizure and destruction of the personal property of residents at the larger Wood Street encampment, despite the City's contrary claims.

    Accordingly, I find that the plaintiffs have established serious questions going to the merits of the state-created danger claim, at least at this juncture, that the injury threatened is irreparable, and that a short, defined delay in the planned evictions is in the public interest. As detailed below, this finding will be reassessed on January 18, 2023, to determine whether sufficient shelter beds are available to house residents displaced by the encampment's closure.

    The plaintiffs should note that while the balance of equities and hardships favor them at this moment, this TRO is not a long-term solution. Indeed, I suspect it will be brief. The 1707 Encampment will close to make room for the affordable housing development planned by the City. That development will significantly benefit the public interest, and the balance of equities will tip toward the City. The plaintiffs should seriously consider offers of shelter extended by the City in the next twelve days.[2]

## TEMPORARY RESTRAINING ORDER

    This TRO shall take effect immediately. It applies to the City of Oakland as the named

---

[2] Because the plaintiffs established a likelihood of success on the merits and irreparable harm in the absence of preliminary relief, along with showing the balance of equities tips in their favor and an injunction is in the public interest, with respect to their Fourteenth Amendment state-created danger claim, I need not address whether they established the *Winter* requirements for their remaining claims at this point.

defendant, as well as its officers, agents, servants, employees, and attorneys; and persons who are in active concert or participation with the foregoing individuals and entities.  These individuals and entities are hereby **RESTRAINED** from proceeding with planned removal of persons, personal possessions, structures, and vehicles (including inoperable, burned out, unidentifiable, or any other vehicles) from the 1707 Encampment; closing the 1707 Encampment; or otherwise removing homeless individuals or their property from the 1707 Encampment.

This TRO does not prohibit restrained individuals from ordinary city cleaning of the streets and sidewalks, from clearing storm drains, or from disencumbering access to fire hydrants or emergency routes, nor does it prohibit any activities or removals that the City typically does and has undertaken in the last month.  It also does not preclude City workers from entering the 1707 Encampment to conduct outreach to residents, including to extend offers for new shelter options. It does not preclude the City from helping residents voluntarily move their belongings to those shelters.  The TRO also does not prohibit particularized removals or other actions that are unrelated to the planned closure of the Wood Street encampment, such as lawfully removing possessions in the course of suppressing a fire or effectuating a lawful arrest for reasons unrelated to the planned closure.

To the extent that the City wishes to carry out removals or cleanings that go beyond its ordinary activities—including removing inoperable vehicles or discarding items that residents contest are not debris—the City may not do so for the duration of this TRO.

This TRO shall remain in place at least until the hearing on January 18, 2023, at 2:00 p.m. via Zoom video conference. Each party may file a brief with declarations by Tuesday January 17, 2023, at 12:00 p.m., explaining progress that has been made regarding offers and/or acceptances of shelter, the status of the cabin community at Wood Street and the RV site in East Oakland, and other relevant updates.  At that point I will assess whether the City has offered or can offer an adequate number of shelter beds to the residents of the 1707 Encampment.  If a sufficient number of alternative shelter options are available to house the residents of the 1707 Encampment and

sufficient offers have been made, this TRO will dissolve.

**IT IS SO ORDERED.**

Dated: January 6, 2023



William H. Orrick
United States District Judge

8